THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | ) |
| | ) |
| xxx xxxxxxxxx Street, N.W., Apartment xxx, | ) |
| Washington, D.C. | ) |
| | ) |

**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT**

     Tucker G. Vanderbunt, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., (hereinafter the "affiant") being duly sworn, deposes and states as follows:

**INTRODUCTION**

     1.    I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

     2.    I have been a Special Agent (SA) with the FBI since 2002. I am currently assigned to Squad CR-3, which is responsible for conducting investigations which target large scale narcotics trafficking organizations. From 2002 until September, 2003, I was assigned to a counterterrorism squad. From 1995 until 2002, I was employed as a law enforcement officer of the State of Georgia, during which time I investigated federal, state, and local narcotics violations which have led to the arrest and conviction of numerous narcotics distributors. Since 1995, I have received training and experience in interview and interrogation techniques, arrest procedures, search and seizure, search warrant applications, narcotics, narcotics investigations, white collar crimes, white collar crime investigations, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; requesting, collecting, and analyzing billing records; conducting court-authorized electronic surveillance; and preparing and executing search warrants.

3.  Based on the experience described in the paragraph above, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other Federal Agents and police officers who are knowledgeable of drug-trafficking investigations, your affiant knows that:

(a)  Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Also, these items are generally maintained in the trafficker's residence, or residences of associates, friends or relatives, in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses, or in business locations with which the trafficker is associated and where the trafficker has ready access to these items. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

(b)  Drug traffickers routinely conceal in their residence or the residences of family members, friends and associates, as well as their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles, stash houses or safe houses) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions;

(c)  It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, strainers, microwave ovens, pots, dishes and other containers for preparing heroin, cocaine and other controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(d)  Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization. These individuals often utilize telephones, cellular telephones and pagers to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(e)  Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(f)  Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities. These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses; and

(g) Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection. Deposits to bank accounts create an accessible record (or paper trail) of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service (IRS). Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting.

(h) Drug traffickers often use coded language and terms to disguise conversations about their drug activities. Drug traffickers also frequently use electronic paging devices commonly known as "pagers" or "beepers" to communicate with co-conspirators. A common technique among drug traffickers is to transmit pre-arranged numerical codes to the pager to communicate information, such as price or quantity of drugs, to the individual in possession of the pager.

(i) Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes. Traffickers often keep computers and computer related equipment in their home and utilize the equipment to keep detailed records of their narcotics transactions. Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking. In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

4. This affidavit is based, in part, upon information provided to me by other Special Agents of the FBI, information provided by cooperating individuals, controlled purchases of illegal drugs, physical surveillance, and other information gathered during the course of this investigation. Since this affidavit is being submitted for the limited purpose of securing authorization for the search of a residence, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the search warrant requested herein.

5. As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents of the FBI who are involved in this investigation, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show that there is probable cause to believe that the fruits, evidence, and instrumentalities of violations of the following federal offenses, among others, are presently to be found at the address described in Section III of this affidavit, specifically, possession with intent to distribute and distribution of controlled substances, in violations of Title 21, United States Code § 841(a)(1).

## II. PROPERTY TO BE SEIZED

1. Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular Marijuana, or other controlled substances.

2. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

3. Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money.

4. United States currency, precious metals, jewelry and financial instruments, stocks and bonds.

5. Photographs, in particular photographs of co-conspirators, assets and/or controlled substances.

6. Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition.

7. Cellular telephones, pagers and records and receipts reflecting their ownership and use.

8. Safes, both combination and key type, and their contents.

9. Indicia of occupancy, residence and/or ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes and keys.

10. Any and all electronic data processing and storage devices, computers and computer systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

## III. DESCRIPTION OF PREMISES

5. This affidavit is respectfully submitted in support of an application for a warrant to search and seize evidence from the property commonly known as:

> Xxx xxxxxxxxx Street, xxxx, Apartment xxx, Washington, D.C. The property is further described as a four story multi-family apartment building. Apartment xxx is located on the third level and is identified by a dark brown door with the numbers xxx located on the door. There is a brown metal security door on the front of the building and the exterior of the building is tan brick.

## IV. THE INVESTIGATION

6. This investigation was initiated by the FBI in July, 2005, based upon information received from a Cooperating Witness (hereinafter referred to as "CW"), who has provided truthful information on numerous occasions about drug traffickers and has never provided any false

information. Two controlled purchases have been made from Larry Clemons at the xxx xxxxxxxxx Street, Apartment xxx, N.W., Washington, D.C., as well as numerous physical surveillances have been conducted. The following includes surveillance by law enforcement and controlled purchases conducted by a CW:

>   (a)     On November 15, 2005, the CW conducted a controlled purchase of cocaine HCl for $1,500 [DEA lab confirms 38.9 grams of cocaine HCl with a purity of 91%] from Larry Clemons at xxx xxxxxxxxx Street, Apartment xxx, N.W., Washington, D.C.
>   (b)     On November 30, 2005, CW conducted a controlled purchase of approximately 15 grams of heroin HCl for $1,500 [Field tested positive for heroin HCl] from Larry Clemons at xxx xxxxxxxxx Street, N.W., Apartment xxx, Washington, D.C.
>   (c)     On February 10, 2006, CW met with Larry Clemons in front of xxx xxxxxxxxx Street, N.W., Apartment xxx, Washington, D.C., and discussed a future narcotics transaction. Clemons was observed parking a silver Buick Century, bearing D.C. tag xxxxxx, in front of xxx xxxxxxxxx xxxxxx, xxxx, Washington, D.C. The vehicle is registered to Larry Clemons at xxxx xxxxxxxxx xxxxxx, xxx., Apartment xx, Washington, D.C. Your affiant believes the apartment number was entered into the motor vehicle database in error as Clemons actually resides in apartment xxx and there is no apartment xx at xxx xxxxxxxxx xxxxxx, x.x.
>   (d)     Since March 1, 2006, at the direction of the FBI, CW has had several conversations with Larry Clemons to arrange for the sale of 110 grams of heroin HCl to Clemons for $75 per gram. Clemons is to pay $5,000 on delivery with the understanding that Clemons would owe the CW the remaining amount of money. The CW has received several calls from Clemons expressing Clemons' interest in the purchase and inquiring when the transaction would occur.
>   (e)     On March 7, 2006, your affiant observed Clemons silver Buick Century, bearing D.C.tag xxxxxx, parked in front of xxx xxxxxxxxx xxxxxx, xxx., Washington, D.C.

7. **xxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx.**

LARRY CLEMONS resides at this location. CLEMONS has been observed, by your affiant and other law enforcement, entering and exiting xxx xxxxxxxxx Street, xxxx, Washington, D.C., on numerous occasions over the course of this investigation, to include as recently as February 10, 2006. Financial databases provide the address of xxx xxxxxxxxx Street, xxx., Apartment xxx, for CLEMONS. CW information confirms that CLEMONS presently resides at xxx xxxxxxxxx xxxxxx, xxx., Washington, D.C.

**V.    CONCLUSION**

11.    Your affiant asserts that the facts contained within this affidavit establish probable cause to believe that the fruit, evidence and instrumentalities of violations of the laws of the United States, specifically 21 U.S.C. §§ 841(a)(1), are presently to be found in the above-listed premises, including items listed in Section II of this affidavit. Therefore, in light of the circumstances and the evidence adduced from this investigation, your affiant respectfully submits that probable cause exists for the issuance of a search warrant for the location/address listed above.

 

TUCKER G. VANDERBUNT, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this _____ day of March 2006.

JOHN M. FACCIOLA
United States Magistrate Judge